June P. ADAMS, Plaintiff,

v.

Anthony M. FRANK, Postmaster
General, Defendant.

Civ. A. No. 88–0637–R.

United States District Court,
E.D. Virginia,
Richmond Division.

May 10, 1989.

Robert P. Geary, Richmond, Va., for
plaintiff.

Debra J. Prillaman, Asst. U.S. Atty.,
Richmond, Va., and Carolyn L. Davis, Office of Field Legal Services, U.S. Postal
Service, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, District
Judge.

This case came before the Court for a
bench trial of the plaintiff's claim of em-

---

ployment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, and on the basis of all the evidence admitted at trial or contained in the parties' exhibits, the Court makes the following findings of fact and conclusions of law. The parties' stipulations are incorporated by reference.

## FINDINGS OF FACT

### A. PARTIES

1. The plaintiff, June P. Adams, is a white adult female citizen of the United States. She has been employed by the United States Postal Service since the middle 1960's.

2. Anthony M. Frank is the Postmaster General of the United States Postal Service.

### B. THE PROMOTION DECISION

3. Adams was originally hired as a stenographer. By December of 1977 Adams held a Grade 14 position as secretary to John Mizell, the Postmaster of the Richmond, Virginia Management Sectional Center. (The Postal Service's Eastern Region is broken down into several Districts, which are further subdivided into Sectional Centers). Though Adams' secretarial post was reevaluated as a Grade 11 position, Adams retained her Grade 14 rate of pay because she had held the position before the reevaluation. Adams had consistently received high ratings on her performance evaluations.

4. Adams was also a social acquaintance of Mizell's. The two belonged to the same Masonic Temple and had attended various social functions.

5. In December, 1977, Adams applied for a Grade 19 position as Manager of Mail Requirements and Services. She was one of three applicants recommended to the Postmaster as "Best Qualified" by a review board. Mizell selected Adams in January, 1978.

6. This promotion was cancelled because one of Adams' evaluations was reviewed by Mizell instead of by the District Manager, as postal regulations require. The position was readvertised and in February 1978 Mizell again selected his secretary from the review board's list.

7. The following month, Frank Oropello, a postal employee who was on the list of those Best Qualified for the position, filed an equal employment opportunity complaint. The complaint alleged that Oropello was not selected for the position because of his sex.

7. The District Manager issued a proposed disposition finding no discrimination, and Oropello requested a decision without a hearing from the regional office, based on the large administrative record developed in the Postal Service's investigation of the complaint. Jack West, Director of Employment and Labor Relations for the Eastern Region, examined the file.

### WEST'S DECISION

8. West concluded that the decision to promote Adams had not been made on the basis of sex. However, West also found that Adams was promoted not because of her merit but because of "gross favoritism" by Mizell.

9. Examples of Mizell's favoritism included his decision to convene a local review board to review the applications despite instructions from the District to convene a district-wide review board; Mizell's approving well over a hundred cash awards to Adams for minor suggestions, such as a $300 award for suggesting that the Post Office charge a service fee on bad checks and $35 for suggesting that a shelf be installed in the women's bathroom; Mizell's insistence that Adams receive a 15% pay raise, even though policy dictated a maximum of 10%; more freely granting overtime to Adams than previous employees in that position; providing Adams with office furniture previously reserved for executive-level positions; and granting Adams the number 2 parking space while she was still his secretary, though Adams' successor as secretary did not receive such an executive space.

10. On March 23, 1979, because of this finding of favoritism, West ordered that Adams' promotion be cancelled and that the opening be readvertised. To ensure that all applicants would be evaluated on an even footing, he instructed the local office not to consider Adams' fifteen months in the position. This instruction is not a postal regulation, but West consistently imposes it because he believes it restores the status quo before the invalid promotion.

11. Adams filed an administrative complaint alleging that her promotion was cancelled because of her race, sex, religion and as a reprisal. The EEOC issued a right-to-sue letter on September 8, 1988. This case followed, in which Adams alleged only sex discrimination in the cancellation of her promotion.

12. After her promotion was cancelled, the position was readvertised and Adams applied again. By this time, Mizell was no longer Postmaster. The new Postmaster, Robert Paine, selected Frank Oropello to fill the position.

13. This was not the last of Adams' EEO complaints. She applied for several other openings, for which she was not selected, and filed EEO complaints on several occasions. In one, filed December 6, 1979, she challenged the promotion of a "Mrs. Lipscomb," also a white female, on numerous grounds, including her race and sex.

14. In November, 1986, Adams was promoted to Postal Operations Analyst, a Level 16 position.

## D. STATISTICAL EVIDENCE

15. Twenty-four employees were promoted to supervisory positions (Level 16 and higher) in the two years preceding Adams' promotion in early 1978. All were men (Plaintiff's Exhibit 3). However, Plaintiff's Exhibit 3 does not describe the sex of the various applicants in the applicant pool for those promotions, nor does it describe how many women were submitted to Mizell as among those Best Qualified. Mizell made these selections.

16. In an unrelated case, a Lewis Lautenslager was selected for a Customer Service Representative position. Because of procedural irregularities Lautenslager's promotion was cancelled twice and he was repeatedly selected. However, Lautenslager was never directed not to mention his brief experience in the position, as Adams was.

17. In another unrelated case, Curtis Hanson was promoted to a Level 16 Budget and Cost Analyst position. Despite procedural irregularities in his promotion, he was not demoted (Testimony of June Adams). However, in that case the irregularity did not involve a finding of favoritism; Hanson's application was merely placed in the wrong file, and the review board called him for an interview at the last minute when they found his application (Testimony of William Dowdy).

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5.

2. The Supreme Court most recently discussed the burden of proof in sex discrimination cases in *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). There the Court held that where a Title VII plaintiff proves that both legitimate and illegitimate motives played a part in an employment decision, the defendant may prevail only by proving by a preponderance of the evidence that it would have made the same decision even without considering the illegitimate factors. *See id.* at ——, 109 S.Ct. at 1788. However, this "mixed motive" approach does not replace the traditional proof framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Hopkins*, —— U.S. at ——, 109 S.Ct. at 1788. Rather, before the "mixed motive" standard of proof applies, the plaintiff must show by a preponderance of the evidence that illegitimate motives played some part in the decision. If the plaintiff cannot present that quality of evidence, then the

case must be decided under the old framework, and the plaintiff cannot prevail unless "she proves, following *Burdine*, that the employer's stated reason for its decision is pretextual." *Id.* at —— n. 12, 109 S.Ct. at 1789 n. 12.

3. This Court must therefore begin by determining whether this case should proceed as a "mixed motives" case or as a "pretext" case (though this decision can ordinarily be made at summary judgment, the *Hopkins* decision was not issued until the eve of trial). The Court concludes that his case should be evaluated as a "pretext" case. Although Adams presented some statistical evidence that most employees promoted to managerial positions are male, she presented no direct evidence whatsoever concerning her particular case, to support her disparate treatment claim that West's decision to cancel her promotion was based on sex. Therefore, even if the statistical evidence presented would be sufficient to demonstrate that the Post Office's articulated reasons were pretextual, it does not rise to the level of proof *Hopkins* requires to treat this case as one involving "mixed motives." In *Hopkins*, the plaintiff presented numerous affidavits firmly establishing that illegitimate motives had played a part in the decision not to promote her. Although plaintiffs may not need to muster proof as convincing as Hopkins did, in this case there is simply no evidence at all relating to the particular decision Adams challenges.

4. In a "pretext" case, the plaintiff must initially prove a *prima facie* case. There is little doubt that Adams met this initial burden: she is a woman who was clearly qualified for the position, but who was demoted from the position despite her qualifications. *See, e.g., McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

5. Once Adams established this *prima facie* case, a presumption arose that the Post Office discriminated against Adams, and the burden shifted to the defendant to articulate a nondiscriminatory reason for the disparate treatment. *See Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094.

6. In this case, the Postal Service rebutted the presumption through the testimony of Jack West. West testified that he ordered Adams' promotion cancelled because he believed that she was selected because of Postmaster Mizell's "gross favoritism" toward his secretary. West detailed the various examples of favoritism that led him to this conclusion.

7. Because the plaintiff retains the burden of persuasion, she cannot prevail unless she proves by a preponderance of the evidence that the defendant's stated reason was a pretext for discriminatory actions. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

8. Adams may demonstrate that the stated reason was a pretext either by presenting direct evidence that her promotion was cancelled because of her sex or by demonstrating that the stated reason is "unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Adams presented no direct evidence that West cancelled her promotion because of her sex. The only evidence she introduced concerning the particular decision was her effort to rebut the charges of favoritism.

9. Based on all the testimony, the credibility of the witnesses, and the trial exhibits, the Court concludes that Adams failed to demonstrate that the defendant's reason should not be believed. She offered very little evidence, even in her own testimony, to rebut the charges of favoritism. For example, in answering West's claim that Mizell insisted upon a 15% pay raise for her, clearly contrary to compensation policy, Adams testified only that she never received it (which the evidence showed was because West rejected Mizell's demand). She offered very little to explain the numerous cash awards she received for frivolous, insignificant suggestions, and admitted that she had no difficulty obtaining authorization for overtime pay. Though she claimed that her executive furniture was brought up from the basement rather than purchased new, she gave no explanation as to why she was permitted to retrieve executive furniture when others were not. Additionally West pointed out

that in Adams' first application to the position, the director of Mail Processing conducted the initial evaluation instead of Adams' supervisor, Mizell. This switch permitted Mizell himself to conduct the final review of her evaluation instead of the District Manager.

10. At various points the plaintiff attempted to introduce statistical evidence that women are rarely promoted in the Postal Service. Statistical evidence is clearly relevant in determining whether a defendant acted with an impermissible motive. *See, e.g., Riordan v. Kempiners,* 831 F.2d 690 (7th Cir.1987); *Black v. City of Akron,* 831 F.2d 131 (6th Cir.1987). However, much of this was merely argument of counsel that was never supported by evidence, and some was simply Adams' recitation of figures without any indication that she had personal knowledge that the numbers were accurate. However, there was some competent statistical evidence: Plaintiff's Exhibit 3, a list of the sex of those promoted in the two years preceding Adams' promotion, and testimony concerning the promotion of Lewis Lautenslager and Curtis Hanson.

11. Despite repeated procedural irregularities in Lautenslager's promotion, neither he nor the review board that reconsidered his application was instructed not to consider his performance while he was serving in the position after his promotion and before the position was readvertised. Adams contends that had she been allowed to discuss her fifteen months as Manager of Mailing Requirements and Services before that promotion was cancelled, she would have been selected by Postmaster Paine instead of Oropello. First, the Court has no jurisdiction to review Paine's decision to promote Oropello; the only decision Adams challenged in this case was her demotion. However, even considering the difference in treatment of Lautenslager and Adams as statistical evidence, the Court concludes that Adams was not treated differently in this respect because she was a woman, but because her case was appealed all the way to the regional level, where West made the decision that her temporary stay in the position should not

be considered. Lautenslager's case was never reviewed beyond the district level. The difference in treatment was not based at all on sex, but only occurred because different people reviewed the two complaints. West apparently had the authority to impose the limitation he did in an effort to guarantee fairness in the readvertisement, even though such a decision is not a Postal Service rule. Comparison with the Lautenslager case does not suggest that Adams was treated differently because of her sex.

12. Similarly, although Curtis Hanson was not demoted when procedural irregularities occurred in his promotion, the character of those irregularities was completely different from Adams' case. Hanson had applied for two separate promotions, and his application to the Budget Analyst position was accidentally placed in the same file as his application for the other position. The review board therefore did not schedule an interview for him. The review board discovered the error before it had finished interviewing candidates, however, and called Hanson in for an interview. This administrative mistake does not suggest in any way that Hanson would not otherwise have been selected, and is totally different from the finding of "gross favoritism" in Adams' case.

13. Finally, Plaintiff's Exhibit 3, which was originally compiled by the Postal Service, shows that of 23 promotions to managerial positions in the two years preceding Adams' promotion, all were male. However, the exhibit does not state, nor was there any other evidence, of the makeup of the applicant pool for these positions or the sex of the applicants recommended as Best Qualified. In light of all the other evidence, and the notable lack of evidence related to the particular decision to cancel Adams' promotion, the Court concludes that these statistics do not sufficiently demonstrate that West's decision to cancel Adams' promotion and readvertise the position were motivated by discriminatory reasons.

14. Considering all of the testimony, the exhibits, and in particular the credibility of

the witnesses, the Court concludes that the defendant's decision to cancel Adams' promotion was not more than likely motivated by her sex. The Court therefore finds in favor of the defendant.

It is so ORDERED.